WILLIAMS CONTROLS, INC.,
a Delaware Corporation,
Plaintiff,

v.

PARENTE, RANDOLPH, ORLANDO,
CAREY & ASSOCIATES, a Central
Partnership, Defendant.

No. 3:CV–96–1474.

United States District Court,
M.D. Pennsylvania.

March 15, 1999.

Peter J. Weidman, Philadelphia, PA, for plaintiff.

Robert D. Schaub, Wilkes—Barre, PA, for defendant.

## MEMORANDUM

VANASKIE, District Judge.

On August 8, 1996, plaintiff Williams Controls, Inc. (Williams) instituted this di-

versity action against defendant Parente, Randolph, Orlando, Carey & Associates (Parente), alleging claims for negligence, negligent misrepresentation, and third party beneficiary breach of contract in connection with Parente's preparation of certain financial information that Williams allegedly relied upon in the purchase of the Kenco Division (Kenco) of Sparkomatic Corporation (Sparkomatic). (Dkt. Entry 1). On May 1, 1997, Parente filed a motion for summary judgment, asserting, *inter alia*, that Williams lacked privity with Parente such that it could not maintain its claims of negligence and negligent misrepresentation, and that Williams was not a beneficiary of Parente's contractual undertakings relative to Kenco. (Dkt. Entry 24.) For the reasons that follow, Parente's motion will be granted as to the negligence claim, but denied as to the negligent misrepresentation and third party beneficiary claims.

## I. BACKGROUND

### A. Material Facts[1]

■ Sparkomatic and Parente had a business relationship for nearly twenty years prior to the events surrounding this action. (Dion Dep. (Dkt. Entry 27) at 17.) For several years prior to its agreement with Williams, Sparkomatic had been attempting to sell its Kenco division. (*Id.* at 4.) Although Parente had prepared audited financial statements for Sparkomatic for 1990 through 1992, Parente had never created a separate audited financial statement for the Kenco Division only. (*Id.* at 18–19.)

On June 14, 1993, Sparkomatic and Williams entered into a Memorandum of Intent for the purchase of "certain assets of the Kenco Division." (Appendix (Dkt. Entry 30), Tab A, Ex. 4.) In this Memorandum of Intent, "audited book value" is defined as follows:

> The term "audited book value" ... refers to certified statements of data which are agreed to by both [Sparkomatic's] certified public accountant and [Williams'] certified public accountant. Such information and data would be prepared by [Sparkomatic's] certified public accountant at the cost of [Sparkomatic] and be reviewed by [Williams'] certified public accountant.

(*Id.* at 7.) Sparkomatic's representative, Ronald Dion (Dion), testified that he believed that the Memorandum of Intent provided that Parente would audit a June 30, 1993 balance sheet that had been prepared by Sparkomatic and presented to Williams. (Dion Dep. (Dkt. Entry 27) at 15, 38; Pl's SMF (Dkt. Entry 33) ¶ 9.) Parente, however, did not audit, nor had any involvement with, the June 30, 1993

---

1. Local Rule 56.1 requires that a party filing a motion for summary judgment also file a separate statement of material facts containing numbered paragraphs and citations to the record. Parente has complied with this requirement. Local Rule 56.1 also requires a party opposing a motion for summary judgment to deny or admit each numbered paragraph of the moving party's statement of material facts. Williams has failed to adhere to this requirement. Instead, Williams has prepared its own statement of material facts without any reference to Parente's statement of material facts.

Although Williams' statement contains numerous numbered paragraphs, none of those paragraphs correspond to the paragraphs contained within Parente's statement of material facts. Therefore, it is impossible to determine which of Parente's statements of fact Williams admits or denies. Williams does not even specifically designate the facts that are in dispute; rather, it simply states "several" facts are disputed by the parties.

Williams has violated Local Rule 56.1, which was drafted to create a simple means through which the parties could identify for the court the relevant factual disputes in connection with a summary judgment motion. Given Williams' failure to file a separate, concise statement of fact responding to the numbered paragraphs set forth in Parente's statement of facts, Parente's statement of facts will be deemed admitted under Local Rule 56.1. Williams' statement of material facts along with the entire record, however, have been considered to ascertain the relevant factual background for this matter.

balance sheet. (Def's SMF (Dkt. Entry 24) Ex. A, ¶ 8.) [2]

In late June or early July 1993, Parente became aware of the proposed sale of Kenco Division by Sparkomatic to Williams. (Pelesh Dep. (Dkt. Entry 28) at 16–17.) On July 27, 1993, Sparkomatic formally engaged Parente to perform certain accounting work with respect the Kenco Division, namely, to audit Kenco Division financial statements for December 31, 1992, December 31, 1991, and December 31, 1990. (Def's SMF (Dkt. Entry 24) Ex. A, ¶¶ 4–5.) Moreover, Parente was also engaged to certify an "interim balance sheet" which would be prepared by Sparkomatic management and presented as part of the closing documents. This interim balance sheet was to be dated July 31, 1993 and certified by September 13, 1993. (*Id.* ¶ 5; Pelesh Dep. (Dkt. Entry 28) at 13.) Williams was *not* mentioned in this engagement letter. (*Id.* ¶ 6.)

On July 27, 1993, Parente prepared a planning memorandum which provided:

> We have been engaged to audit Kenco Engineering, a division of Sparkomatic Corporation, for the years ended December 31, 1992, 1991 and 1990. Kenco is in the process of being sold, and as part of the sale agreement, audited financials are necessary.

(Appendix (Dkt. Entry 30) Tab A, Ex. 11.) [3] Williams is not mentioned in this planning memorandum.

On August 1, 1993, Sparkomatic and Williams executed an Asset Purchase Agreement concerning the purchase of Kenco Division. (Def's SMF (Dkt. Entry 23) Ex. A, ¶ 9.) The Asset Purchase Agreement provided that the June 30, 1993 balance sheet was *unaudited* and that it had *not* been prepared by Parente, but rather had been certified by a Sparkomatic financial officer. (Appendix (Dkt. Entry 30) Tab A, Ex. 5, ¶ 1.6.) The Asset Purchase Agreement provided that Sparkomatic would provide Williams with the following documentation within thirty days of the closing date:

> (a) True and complete copies of the Balance Sheet, related statements of income and retained earnings and related statements of cash flows of the Business as of and for the years ended December 31, 1992, 1991 and 1990 and the period from January 1, 1993 up to and through the Closing Date prepared in accordance with GAAP and audited by Sparkomatic's independent public accountants; and

> (b) A true and complete copy of the Interim Balance Sheet; and

> (c) A true and complete copy of the Closing Balance Sheet.

(*Id.* ¶ 2.4) Thus, as of August 1, 1993, Williams was aware that the June 30, 1993 balance sheet had not been prepared by Parente and that it would not be certified or audited by Parente.[4]

---

**2.** Williams contends that in June of 1993 Sparkomatic provided Williams' representative, Thomas Itin (Itin), with audited financial statements for Kenco Division prepared by Parente. (Pl's SMF (Dkt. Entry 33) ¶ 4.) As noted, however, Parente *never* performed a separate audit of the Kenco Division. At most, Itin may have been provided with Parente's audits of Sparkomatic as a whole prior to the signing of the Memorandum of Intent. Williams, however, has presented *no* evidence that Parente was aware that its audited financial statements for Sparkomatic were going to be used as a basis for the sale of the Kenco Division. Moreover, Parente was not even retained to perform the audit of the Kenco Division's financial statements prior to the signing of the Memorandum of Intent. Accordingly, Williams' alleged reliance upon purported audited financial statements as a basis to assert liability against Parente for matters occurring prior to the closing on the purchase of the Kenco Division lacks an adequate factual foundation.

**3.** Although it appears that this planning memorandum was drafted on June 30, 1993, it was not actually signed by a Parente partner until July 27, 1993—the same date as the engagement letter.

**4.** As noted earlier, Itin suggests that he reviewed various financial statements prepared by Parente in connection with the decision to enter into the Asset Purchase Agreement. No such documentation accompanied the Asset Purchase Agreement. Instead, only the June

In relation to the audited financial statements, the Asset Purchase Agreement provided that Williams or its independent public accountant would have access to Sparkomatic's records and work papers as well as Sparkomatic's independent public accountant's records and work papers for review. (*Id.* ¶ 1.6) After the closing balance sheet was submitted to Williams, the Asset Purchase Agreement afforded Williams "the right, at its own expense to observe the taking of inventory on behalf of the Seller in connection with the preparation of the Closing Balance Sheet and to submit such Closing Balance Sheet to its own internal accounting and auditing staff or independent public accountants (at Purchaser's expense) for verification, such verification to be concluded no later than 30 days after the Purchaser's receipt." (*Id.*)

The Asset Purchase Agreement extended additional safeguards to Williams:

> 5.6 Examination and Investigations. Prior to the Closing Date, the Purchaser shall be entitled, through its employees and representatives, including, without limitation, Brenman Raskin & Friebold, P.C., and its lenders, appraisers and *accountants*, to make such *investigation of the assets, properties, business and operations of the Business, and such examination of the books, records and financial condition of the Business as the Purchaser wishes.* Any such investigation and examination shall be conducted at reasonable times and under reasonable circumstances and the Seller shall cooperate fully. The Seller shall furnish the representatives of the Purchaser with all information and copies of documents concerning the affairs of the Business as representatives of the Purchaser may reasonably request and shall cause the Seller's officers, employees, consultants, agents, accountants and attorneys to cooperate fully with the Purchaser's representatives in connection with such review, examination and investigation. If, through the Purchaser's examination and investigation, the Purchaser discovers discrepancies in the books and records of the Division or any other matter unacceptable to the Purchaser, the Purchaser shall give prompt written notice to the Seller in accordance with Section 11.7 and the Seller shall have ten days thereafter to resolve the matter(s) to the satisfaction of the Purchaser or the Purchaser shall have the right to terminate this Agreement under Section 10.1. If the Seller is unable to resolve the matter within the prescribed period and the Purchaser does not elect to terminate the Agreement in accordance with Section 11.7 and the Closing occurs, as of the Closing Date the Purchaser shall be deemed to have automatically waived its right to demand that the matter be resolved following the Closing. No review, examination or investigation by the Purchaser, shall diminish or obviate any of the representations, warranties, covenants or agreements of the Seller under this Agreement.

(*Id.* (emphasis added).)

Aside from a reference to Sparkomatic's independent public accountants, Parente was not identified, directly or indirectly, in the Asset Purchase Agreement. (Def's

---

30, 1993 balance sheet was attached. In his declaration, Itin stated that he understood the Asset Purchase Agreement as providing that the June 30, 1993 balance sheet was prepared and audited by Parente. Itin contends that he relied upon representations that the June 30, 1993 balance sheet accurately represented the financial condition of Kenco Division. Finally, Williams argues that because its "accountant was not present when these audits of the Division occurred, [Itin] relied exclusively upon the fairness and accuracy of Defendant's audits in deciding to purchase the Division."

This argument is frivolous. The Asset Purchase Agreement plainly provided that the June 30, 1993 balance sheet was unaudited and prepared by one of Sparkomatic's financial officers. Moreover, the June 30, 1993 balance sheet was actually signed and certified by Dion, not Parente. The Agreement also specifically identified the documentation that would be prepared by Parente and did not provide that the June 30, 1993 balance sheet would be audited. Finally, as discussed *infra*, Parente did not provide audited financial statements until after the actual closing.

SMF (Dkt. Entry 24) Ex. A, ¶ 10.) Parente admitted, however, that it reviewed the Asset Purchase Agreement with Sparkomatic prior to closing. (Pelesh Dep. (Dkt. Entry 28) at 14–17.)

On August 14, 1993, the closing was held. (Def's SMF (Dkt. Entry 24) Ex. A, ¶ 16.) At the time of the closing, Williams had not yet received any audited material from Parente in relation to the Kenco Division. A month after the closing, on September 15, 1993, Kenco Division financial statements for the years ending December 31, 1992, 1991, and 1990, which were prepared by Sparkomatic and audited by Parente according to the terms of the engagement letter, were transmitted to Sparkomatic. (Def's SMF (Dkt. Entry 24) Ex. A, ¶ 17 .) On September 17, 1993, the closing balance sheet, prepared by Sparkomatic and audited by Parente in accordance with the terms of the engagement letter, was transmitted to Sparkomatic. (Id. ¶ 18.) At some point thereafter, Sparkomatic provided these audited reports and balance sheet to Williams.[5]

The Asset Purchase Agreement provided that the final purchase price could be adjusted either upward or downward "by an amount equal to the difference in the net book value on the Closing Balance Sheet as compared to the Interim Balance Sheet." (Appendix (Dkt. Entry 30) Ex. A, ¶ 1.6.) It is undisputed that Parente audited the financial information necessary for the final closing balance sheet. It is undisputed that Parente reviewed the Asset Purchase Agreement with Sparkomatic

and, therefore, had notice that its work product would be used to determine the final adjusted purchase price for the Kenco Division.

Williams had an independent public accountant, namely Kronick, Kalada & Berdy, review Parente's work papers with respect to the Closing Balance Sheet in late September 1993. (Def's SMF (Dkt. Entry 24) Ex. A, ¶ 21.) At the conclusion of this review, Williams' independent public accountants determined that there were no errors in Parente's work and, thus, no adjustments in the purchase price were necessary. (Id. ¶ 22.) Although Parente's work papers for the years 1990, 1991 and 1992 were available for review, Williams' independent public accountant failed to review those documents. (Id. ¶ 23.)

## B. Procedural History

Parente originally filed a motion to dismiss, asserting, *inter alia,* that no privity existed between it and Williams. (Dkt. Entry 6.) After a case management conference with the parties, Parente's motion to dismiss was denied without prejudice, with the understanding that Parente would advance the same arguments in a summary judgment motion after limited discovery. (Dkt. Entry 16.) The parties entered into a stipulation governing discovery. (Dkt. Entry 15.)[6] On May 1, 1997, after the conclusion of the limited discovery, Parente filed its motion for summary judgment. (Dkt. Entry 24.)

5. Parente's report transmitted with the Closing Balance Sheet provided:
   This report is intended solely for the information and use of the boards of directors of Kenco Engineering and KENCO/WILLIAMS, INC. and should not be used for any other purpose.
   (Id. ¶ 19.) Professional accounting standards required that this statement be contained in Parente's report and it was intended to limit distribution of Parente's report. (Id. ¶ 20.)

6. In pertinent part, the stipulation limited discovery to the following:

a) discoverable facts concerning the issues of privity of contract between [Parente] and [Williams];
b) discoverable facts concerning the existence of a duty on the part of [Parente] to [Williams] concerning its performance of accounting services; and
c) discoverable facts concerning the existence of third party beneficiary status of [Williams] under the terms of [Parente's] engagement with Sparkomatic to perform accounting services.
(Stipulation (Dkt. Entry 15) at 2.)

## II. DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 329, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir.1988); *Continental Ins. Co. v. Bodie*, 682 F.2d 436 (3d Cir.1982). Once the moving party has satisfied its burden, the nonmoving party "must present affirmative evidence to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. The affirmative evidence must consist of verified or documented materials. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990). Rule 56 requires the entry of summary judgment, after adequate time for discovery, where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### A. Negligence

The Pennsylvania Supreme Court requires privity between a plaintiff and a defendant-accountant to maintain a professional negligence action. In *Landell v. Lybrand*, 264 Pa. 406, 107 A. 783 (1919), the plaintiff claimed that he had been induced to purchase stock in a company and that he relied upon reports that had been prepared for the company by the defendant-accountants. The plaintiff brought a negligence action against the defendant-accountants. In response, the Pennsylvania Supreme Court stated:

There was no contractual relationship between the plaintiff and defendants, and, if there is any liability from them to him, it must arise out of some breach of duty, for there is no averment that they made the report with the intent to deceive him. The averment in the statement of claim is that the defendants were careless and negligent in making their report; but the plaintiff was a stranger to them and to it, and, as no duty rested upon them to him, they cannot be guilty of any negligence of which he can complain.

*Id.* at 408, 107 A. 783.

A decade later, in the seminal case of *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931), the New York Court of Appeals considered whether an accountant could be liable for professional negligence in the absence of privity. After noting the policy arguments that supported the "citadel of privity," Judge Cardozo, writing for the court, determined that a plaintiff may not institute a negligence action against an accountant in the

absence of privity. In making this conclusion, Judge Cardozo stated:

> Our holding does not emancipate accountants from the consequences of fraud. It does not relieve them if their audit has been so negligent as to justify a finding that they had no genuine belief in its adequacy, for this again is fraud. It does no more than say that, if less than this is proved, if there has been neither reckless misstatement nor insincere profession of an opinion, but only honest blunder, the ensuing liability for negligence is one that is bounded by contract, and is to be enforced between the parties by whom the contract has been made. We doubt whether the average business man receiving a certificate without paying for it, and receiving it merely as one among a multitude of possible investors, would look for anything more.

*Id.* at 189, 174 N.E. 441. Thus, the privity rule for professional negligence actions against accountants has a rich tradition.

In *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983), the Pennsylvania Supreme Court considered "whether a named beneficiary of a will who is also named executrix has a cause of action against the attorney who drafted the will and directed her to witness it where the fact that she witnessed the will voided her entire legacy and her appointment as executrix." *Id.* at 50, 459 A.2d 744. In the course of its opinion, the Pennsylvania Supreme Court upheld the "strict privity" rule for professional negligence actions, stating that a professional negligence action requires "[a]t the very least, ... a specific undertaking on the attorney's part to perform a specific service for a third party, coupled with the reliance of the third party and the

attorney's knowledge of that reliance in order for the third party to bring suit." *Id.* at 55, 459 A.2d 744.[7] Relying in part upon Judge Cardozo's opinion in *Ultramares,* the court specifically rejected the argument that the attorney's duty should be measured in terms of foreseeability:

> We find that the policy concerns expressed in *Ultramares* and the history of California, following its abolition of the privity requirement in negligence suits arising out of arrangements to furnish professional services, persuade us we should not eliminate the privity requirement in malpractice actions based on negligence. Thus we retain the requirement that plaintiff must show an attorney-client relationship or a specific understanding by the attorney furnishing professional services, as in *Lawall,* as a necessary prerequisite for maintaining such suits in trespass on a theory of negligence.

*Id.* at 58, 459 A.2d 744; *see also Cost v. Cost,* 450 Pa.Super. 685, 694, 677 A.2d 1250, 1255 (1996) (finding where plaintiff never sought legal advice from defendant-attorneys, plaintiff could not maintain a professional negligence claim), *app. denied,* 547 Pa. 727, 689 A.2d 233 (1997); *Atkinson v. Haug,* 424 Pa.Super. 406, 411–12, 622 A.2d 983 (1993) ("Absent an express contract, an implied attorney/client relationship will be found if 1) the purported client sought advice or assistance from the attorney; 2) the advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing

---

7. In making this pronouncement, the court relied upon *Lawall v. Groman,* 180 Pa. 532, 37 A. 98 (1897). In *Lawall,* a mortgagee sued an attorney for failing to properly conduct a lien search to ensure that her mortgage would be first in priority. The attorney's fees, however, were paid by the mortgagor. Despite the absence of a fee agreement, the court found that the attorney had been effectively representing both clients, that he owed a duty to the mortgagee, and that the mortgagee could maintain an action for professional negligence. *Id.* at 539, 37 A. 98. In this case, it cannot reasonably be maintained that Parente was representing both Sparkomatic and Williams. In fact, the record demonstrates that Williams retained its own accountant to review Parente's work.

him.").[8]

Given the holding in *Landell* and *Guy*'s explicit approval of *Ultramares*, federal courts have determined that Pennsylvania law does not permit a professional negligence claim against accountants in the absence of privity. In *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp.*, 899 F.Supp. 1399 (W.D.Pa.1994), the defendant accounting firm was hired by a company to audit its financial statements. *Id.* at 1402. The intervenor-plaintiffs, who had business relationships with the firm for which the defendant was auditing financial statements and were to be provided copies of the financial statements under the agreement between the defendant and its client, alleged that the defendant had failed to adhere to general accounting principals in the course of its audits and that the intervenor-plaintiffs suffered economic injuries when they relied upon those audits. In dismissing the intervenor-plaintiffs' professional negligence claim, the court stated, "it is still the law in Pennsylvania that an

action for professional negligence may not be maintained absent privity of contract between the parties." *Id.* at 1406; *see also In re Phar–Mor, Inc. Sec. Litig.*, 892 F.Supp. 676, 694 (W.D.Pa.1995) (noting that a professional negligence claim may not be maintained against an accountant in the absence of privity); *Sadtler*, 402 Pa.Super. at 499, 587 A.2d 727 ("[C]ourts have held that actions against accountants for professional negligence are generally based on contract.").

Likewise, in *Pell v. Weinstein*, 759 F.Supp. 1107 (M.D.Pa.1991), *aff'd mem.*, 961 F.2d 1568 (3d Cir.1992), Judge McClure stated:

> In Pennsylvania, an action for professional negligence cannot be maintained unless there is privity of contract between the parties....
>
> The plaintiffs argue that the current business environment demands the establishment of a new benchmark for accountant liability in Pennsylvania which abandons the requirement of privity.

8. The Pennsylvania Superior Court has adhered to the privity requirement in other professional contexts. In *Linde Enters., Inc. v. Hazelton City Auth.*, 412 Pa.Super. 67, 602 A.2d 897, *app. denied*, 533 Pa. 601, 617 A.2d 1275 (1992), the plaintiff-contractor entered into an agreement with a municipal authority to reconstruct a dam. The municipal authority entered into a separate agreement with an engineering firm for the design and supervision of the project. As a result of negligence on the part of the engineering firm, the project encountered substantial difficulties and delays. The plaintiff-contractor attempted to assert a claim against the engineering firm for negligence, despite the absence of privity. The plaintiff-contractor argued that the engineering firm was responsible under Pennsylvania law for deficiencies in its design and specifications. *Id.* at 76 n. 3, 602 A.2d 897.

The Pennsylvania Superior Court agreed that engineers were liable for any negligence in connection with the design and specifications, but noted that such liability was limited to "the person with whom the person contracted to draw the plans or specifications." *Id.* (citing *Follansbee Bros. Co. v. Garrett–Cromwell Eng'g Co.*, 48 Pa.Super. 183, 185 (1911)). Although acknowledging that other jurisdictions had allowed contractors to maintain claims against engineers and architects, despite the lack of privity, the court refused to create such a rule in Pennsylvania. *Id.* at 76–77, 602 A.2d 897. Because the plaintiff-contractor lacked privity, the Pennsylvania Superior Court determined that it could not assert a claim against the engineering firm for its negligent preparation of plans, specifications, or designs or any other negligence in connection with the supervision of the project. *Id.* at 77, 602 A.2d 897 ("We will continue the status quo, as [the plaintiff-contractor] has not offered a compelling reason why we should deviate from the well-established requirement of privity to adopt a rule holding negligent architects directly liable for economic damages to contractors with whom they share no contractual privity."); *see also Fidelity & Guaranty Ins. Underwriters, Inc. v. American Buildings Co.*, No. 3:CV–95–0129, slip op. at 37–38 (M.D.Pa July 31, 1998)(finding that plaintiff could not assert a claim for professional negligence against defendant under Pennsylvania law in connection with design defects in a prefabricated warehouse where plaintiff was not in privity with the defendant); *Sadtler v. Jackson–Cross Co.*, 402 Pa.Super. 492, 587 A.2d 727 (1991) (finding no professional negligence claim against real estate appraiser could be maintained in the absence of privity).

However, this is an argument more properly presented to the Pennsylvania courts. *It is beyond question that under current Pennsylvania law, privity is required in an action for professional negligence.*

*Id.* at 1120 (emphasis added); *see also Wilder v. Williams,* No. 87–1043, 1989 WL 67821, at *3 (W.D.Pa. Feb.7, 1989) (finding that negligence claim against accountants could not be maintained in the absence of privity); *Pennine Resources, Inc. v. Dorwart Andrew & Co.,* 639 F.Supp. 1071, 1072 (E.D.Pa.1986) (same). Moreover, Parente has found itself in the position of Williams—asserting a third party negligence claim against an auditor of financial records with which it lacked privity. *See Hartford Accident & Indemnity Co. v. Parente, Randolph, Orlando, Carey & Assocs.,* 642 F.Supp. 38, 39 (M.D.Pa.1985). Parente's third party negligence claim was dismissed in that case because Parente lacked privity with the third party defendant-auditor. *Id.* at 41 ("As the previous cases clearly indicate, privity is required to maintain an action for professional negligence. In the present case, [Parente] ... has failed to allege that [the third party defendant] had a relationship with ... [Parente] and therefore it fails to state a claim for professional negligence.").

▮ Williams argues that "strict privity is not required for a negligence claim because privity is given an elastic interpretation." (Pl's Opp.Br. (Dkt. Entry 33) at 3.) Williams argues that Parente had knowledge that its services were being provided for Williams in connection with the Kenco Division sale. *Id.* In particular, Williams focuses upon the following language in *Phar–Mor:*

> A number of plaintiffs ... cite to our opinion in *Blaushild v. Grodin, Chotiner & Balmuth,* [897 F.Supp. 904 (W.D.Pa. 1994) ], as support for the abolition of the privity rule. To the contrary, although we rejected the defendant accountants' privity defense, we did so on the basis that the facts in *Blaushild*

established that the accountants were, in all practical respects, in privity with the plaintiffs. The defendants' engagement in that case was specifically requested, not by the client, but by the *plaintiffs,* who had already agreed to purchase Pittsburgh Plumbing & Heating Supply Corporation. The defendants were aware of the specific and singular purpose of the engagement, which was to prepare financial information for the *plaintiffs* so that they could determine the exchange ratio of the stock used in the purchase transaction. In holding that the facts establish a privity relationship because defendants specifically undertook the engagement to supply information to the plaintiffs, *see, Guy,* 459 A.2d at 750, we emphasized that "we have made no dramatic retreat from the privity rule under Pennsylvania law."

*Phar–Mor,* 892 F.Supp. at 690 n. 16 (emphasis in original). Williams argues that Parente was engaged for a singular purpose—to prepare and audit financial statements which were to be used by Williams pursuant to the agreement. Moreover, Williams avers that Parente was also cognizant that the financial statements would be used to determine the ultimate purchase price for the Kenco Division. As such, Williams contends that this case is analogous to *Blaushild.*

Although *Blaushild* does indeed hold that a negligence claim against an accountant may be pursued by a party whose relationship only "*approach[es]* that of privity," 897 F.Supp. at 906 (emphasis added), I find it unpersuasive for several reasons. First, it relied upon a district court decision, *Coleco Industries, Inc. v. Berman,* 423 F.Supp. 275, 309 (E.D.Pa. 1976), *aff'd in part, rev'd in part,* 567 F.2d 569 (3d Cir.1977), *cert. denied,* 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978), that was decided under New Jersey law, not Pennsylvania law. Second, *Coleco* was decided prior to the Pennsylvania Supreme Court's decision in *Guy,* which firmly reaffirmed the requirement of privi-

ty in professional malpractice cases. And third, *Coleco* concerned liability "for careless financial *misrepresentation*," 423 F.Supp. at 310 (emphasis added), *i.e.*, negligent misrepresentation. Indeed, *Phar–Mor* discussed *Blaushild* in the context of a negligent misrepresentation claim, a claim which, as discussed *infra*, warrants separate consideration. Accordingly, *Blaushild* does not compel rejection of the privity requirement here.

*Guy* requires a specific undertaking to perform a specific service *for the plaintiff.* No such undertaking has been shown here. Accordingly, Parente's motion for summary judgment on Williams' negligence claim will be granted.

## B. Negligent Misrepresentation

■ Parente contends that the negligent misrepresentation claim must fail for the same reason that warrants the dismissal of the negligence claim—the absence of privity between Parente and Williams. Williams argues that the evolving law of negligent misrepresentation has eliminated the privity requirement. In assessing these positions, it is necessary to consider first, § 552 of the Restatement (Second) of Torts, and, second, the interpretation of § 552 by the Pennsylvania courts.

### 1. Restatement (Second) of Torts § 552

The Pennsylvania Supreme Court has adopted Section 552 of the Restatement of Torts. *See Rempel v. Nationwide Life Ins. Co.*, 471 Pa. 404, 370 A.2d 366 (1977). Other courts have determined that the second Restatement version is substantially the same as the first version and that the Pennsylvania courts would likewise adopt § 552 of the Restatement (Second) of Torts. *See J.E. Mamiye & Sons, Inc. v. Fidelity Bank*, 813 F.2d 610, 615 (3d Cir. 1987); *Eisenberg v. Gagnon*, 766 F.2d 770, 778 (3d Cir.). *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *see also Moffatt Enters., Inc. v. Borden Inc.*, 807 F.2d 1169, 1174 (3d Cir.1986) ("Penn-

sylvania has adopted Restatement (Second) of Torts § 552 regarding the elements of negligent misrepresentation."); *In re Herley Sec. Litig.*, 161 F.R.D. 288, 292 (E.D.Pa.1995) ("The Pennsylvania courts have adopted the elements of negligent misrepresentation as set forth in the Restatement (Second) of Torts § 552."); *Baker v. Cambridge Chase, Inc.*, 725 A.2d 757, 769 (Pa.Super.1999) (quoting Restatement (Second) of Torts § 552); *Sevin v. Kelshaw*, 417 Pa.Super. 1, 13, 611 A.2d 1232, 1238 (1992) (same); *Mill–Mar, Inc. v. Statham*, 278 Pa.Super. 296, 299–300, 420 A.2d 548, 550 (1980) (same), *app. dismissed*, 499 Pa. 219, 452 A.2d 1017 (1982). Section 552 of the Second Restatement provides:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise the care or competence in obtaining or communicating the information.

(2) .... The liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552. A brief discussion of the pertinent explanatory comments and illustrations to § 552 is instructive.

First, the section makes clear that a negligent misrepresentation claim may only be maintained against a party who

represents that information to be accurate. *Id.* cmt. E. Furthermore, a negligent misrepresentation claim may only be maintained when the party making the misrepresentation "has a pecuniary interest in the transaction in which the information is given." *Id.* cmt. c. This pecuniary interest requirement is satisfied so long as the defendant is paid valuable consideration for the information. *Id.* cmt. d.

Section 552 provides numerous illustrations concerning accountant liability for negligent misrepresentation to a party in which such accountant is not in privity. Illustration 3 to § 552 provides the following scenario:

> XYZ Corporation seeks a credit of $100,000 from F & Co., a factoring concern. Because the latest XYZ financial statement, audited by A & Co., a partnership of certified public accountants, are dated as of the last fiscal year-end of XYZ Corporation which fell some eight months previously, F & Co. requests that A & Co. be retained to provide unaudited financial statements for the current interim period. A & Co., knowing the statements are being prepared for the consideration of F & Co. in connection with XYZ Corporation's request for the $100,000 credit, prepares financial statements from the books of the corporation without performing any tests of the accuracy of the entries themselves or respecting the transactions represented to underlie them. The statements, furnished under A & Co.'s letterhead, are labeled "unaudited" on each page and accompanied by a written representation that they have not been audited and that, accordingly, A & Co. is not in a position to express an opinion upon them. Nothing comes to A & Co. in the course of preparing the statements to indicate that they were incorrect, but because the books from which they were prepared were, unknown to A & Co., in error, the financial statements materially misstate the financial position of XYZ Corporation

> and its results of operations for the period subsequent to the preceding fiscal year-end. F & Co., because it extends the credit in reliance upon the statements, suffers substantial pecuniary loss. A & Co. is not subject to liability to F & Co.

*Id.* III. 3. There are several reasons for this result. First, the accounting firm specifically represented that the figures were not audited. As such, F & Co., the recipient of the information, could not reasonably rely upon the accuracy of the financial reports. Moreover, the facts also demonstrate that the accounting firm exercised reasonable care in that it failed to discover any facts that would have called into question the accuracy of its client's books. This illustration, however, suggests that the accounting firm could be held liable in the absence of privity, but that the accounting firm was not liable because it exercised reasonable care and accurately represented the efforts that it undertook.

Other illustrations in § 552 make clear that an accounting firm may be liable for negligent misrepresentation in the absence of privity:

> A is negotiating with X Bank for a credit of $50,000. The Bank requires an audit by independent public accountants. A employs B & Company, a firm of accountants, to make the audit, telling them that the purpose of the audit is to meet the requirement of X Bank in connection with a credit of $50,000. B & Company agrees to make the audit, with the express understanding that it is for transmission to X Bank only. X Bank fails, and A, without any further communication with B & Company, submits its financial statements accompanied by B & Company's opinion to Y Bank, which in reliance upon it extends a credit of $50,000 to A. The audit is so carelessly made as to result in an unqualified favorable opinion on financial statements that materially misstates the financial position of A, and in consequence Y Bank suffers pecuniary loss through its

extension of credit. B & Company is not liable to Y Bank.

*Id.* III. 5. The reason that the accounting firm in Illustration 5 is not liable is that it intended to provide the financial information to X Bank only. If the client had not limited the use of the information solely to X Bank, then the accounting firm would have been liable for negligent misrepresentation to Y Bank.[9] If, however, an accounting firm is retained to perform a routine audit, without any indication that its work product will be used for some other purpose, then the accounting firm will not be liable for negligent misrepresentation. *Id.*[10]

It is clear, therefore, that under § 552, Williams has a viable claim against Parente with respect to the audited financial statements of the Kenco Division and the closing balance sheet provided to Parente in September of 1993. Sparkomatic retained Parente for the express purpose of auditing and preparing financial statements in connection with the sale of the Kenco Division. Parente was aware that its work was to be presented to Williams in connection with determining the final purchase price of the Kenco Division. Thus, if Parente was negligent in its preparation of the financial statements that were given to Williams in September of 1993, Parente may be liable for negligent misrepresentation under Restatement (Second) of Torts § 552.[11]

## 2. Pennsylvania's Application of Section 552

Under Pennsylvania law, the tort of negligent misrepresentation has been interpreted to require a plaintiff to prove:

(1) a misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must

9. Illustrations 6 and 7 plainly support this conclusion:

> 6. The same facts as in Illustration 5, except that nothing is said about supplying the information for the guidance of X Bank only, and A merely informs B & Company that he expects to negotiate a bank loan, for $50,000, requires the audit for the purposes of the loan, and has X Bank in mind. *B & Company is subject to liability to Y Bank.*
> 7. The same facts as in Illustration 5, except that A informs B & Company that he expects to negotiate a bank loan, but does not mention the name of any bank. *B & Company is subject to liability to Y Bank.* [Emphasis added.]

10. See, for example, Illustration 10:

> A, an independent public accountant, is retained by B company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditors opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualified favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is not liable to X Bank.

In accordance with this illustration, Parente could not be held liable to Williams with respect to any financial statements Parente prepared or audited prior to Williams entering into its agreement with Sparkomatic because there was no *evidence* that Parente understood that such work would be used in connection with a contemplated sale of the Kenco Division.

11. Conversely, even if there was competent evidence that Williams had been supplied audited financial statements or a balance sheet of the Kenco Division before executing the Asset Purchase Agreement, Williams would not have a viable negligent misrepresentation claim against Parente on account of those documents because Williams was not identified as the intended recipient or as being within a class of intended recipients when those documents would have been prepared. As indicated in footnote 2 *supra*, there is no competent evidence that would support a claim *against Parente in connection with* Williams' decision to enter into the transaction with Sparkomatic. Accordingly, any claim against Parente is limited to the financial information supplied in September of 1993, after the closing on the transaction.

**530**

make the misrepresentation without knowledge as to its truth or falsity or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend the representation to induce another to act on it; and (4) injury must result to the party acting in justifiable reliance on the misrepresentation. *Burland v. ManorCare Health Servs., Inc.,* No. 98–4802, 1999 WL 58580, at *3 (E.D.Pa. Jan.26, 1999) (quoting *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994)); *Weisblatt v. Minnesota Mutual Life Ins. Co.,* 4 F.Supp.2d 371, 377 (E.D.Pa.1998) (same). As noted above, Section 552 makes clear that an accountant in Parente's position may be liable to a third party in the absence of privity where the accountant was aware that its work product would be used to induce the third party to make a purchase. The penultimate question is whether this approach is consistent with Pennsylvania law.

In *Wilder v. Williams,* No. 87–1043, 1989 WL 67821 (W.D.Pa. Feb.7, 1989), the plaintiffs purchased a leasing company, relying in part upon financial documents prepared by the defendant-accountants. *Id.* at *1–2. Because the plaintiffs were not in privity with the defendant-accountants, the court dismissed the professional negligence claim. *Id.* at *3 ("In Pennsylvania, a claim for such malpractice can only be brought by a party in privity with the defendants."). The defendant-accountants argued that the plaintiffs' negligent misrepresentation claim likewise had to be dismissed because the plaintiffs were not in privity with the defendant-accountants. The court found that privity was not required under § 552 of the Restatement (Second) of Torts. *Id.* at *4. Because § 552 had been adopted in Pennsylvania, the court refused to dismiss the negligent misrepresentation claim against the defendant-accountants. *Id.* Other federal courts in Pennsylvania have likewise permitted negligent misrepresentation claims to proceed in the absence of strict privity. *See*

*In re Chambers Dev. Sec. Litig.,* 848 F.Supp. 602, 626 (W.D.Pa.1994) ("The Court also rejects [defendant-accountants'] claims that the Pennsylvania common law of negligent misrepresentation requires privity between the buyer of the security and the defendant[-accountant]."); *In re Westinghouse Sec. Litig.,* 832 F.Supp. 948, 987 (W.D.Pa.1993) (finding privity not required under Pennsylvania law for tort of negligent misrepresentation), *aff'd in part, rev'd in part,* 90 F.3d 696 (3d Cir.1996); *Alten v. Atlantic Fin. Fed.,* 805 F.Supp. 5, 6–7 (E.D.Pa.1992) (finding that investors could assert negligent misrepresentation claims against accounting firm even where the investors "had no knowledge of [the accounting firm's] involvement [in preparing financial statements] upon making their investment decision"); *Schor v. Hope,* No. 91–443, 1992 WL 22189, 1992 U.S. Dist. LEXIS 1083, at *21 (E.D.Pa. Feb. 4, 1992) (finding that where accountants provided information to potential investor at request of client, investor could maintain a claim for negligent misrepresentation).

In *Kline v. First Western Government Securities,* 794 F.Supp. 542 (E.D.Pa.1992), *aff'd in part, rev'd in part,* 24 F.3d 480 (3d Cir.), *cert. denied,* 513 U.S. 1032, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994), the plaintiffs had relied upon opinion letters prepared by the defendant-accountant in making certain investments. The defendant-accountant contended that it made a disclaimer to the effect that its opinion letter was only intended for a limited group and that the plaintiffs were not within that group. The court noted, however, that there was a dispute of material fact as to whether the accountant "knew ... that [its client] was giving the opinion letters to the class of prospective customers. Plaintiffs can recover if they are members of a class 'for whose benefit and guidance [defendant] knows that the recipient intends to supply [the information].'" *Id.* at 555. Therefore, the plaintiffs were allowed to proceed with the negligent misrepresentation claim despite the absence of privity.

Indeed, Parente has previously failed in this Court in advancing a "privity" argument to defeat a negligent misrepresentation claim. In *Hartford Accident & Indemnity Co. v. Parente, Randolph, Orlando, Carey & Assocs.*, No. 85–626, 1989 U.S. Dist. LEXIS 9411 (M.D.Pa. July 31, 1989), the plaintiff entered into an agreement with the Old Forge Bank to indemnify it for losses under a blanket bond. The bank made a claim under its blanket bond for losses arising from embezzlement by an employee. The plaintiff reimbursed the bank for its losses then instituted a suit against, *inter alia*, Parente for negligent misrepresentation in connection with directors' examinations that were performed by Parente and relied upon by the plaintiff in insuring the bank. *Id.* at *11. As in this case, Parente argued that the complaint had to be dismissed because "the complaint fail[ed] to state a contractual relationship or privity between plaintiff and [Parente] and that such privity is necessary in a claim for professional negligence." *Id.* After considering § 552, the court determined that privity was not a requirement for negligent misrepresentation claims. *Id.* at 12 (citing *Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir.), *cert. denied*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985)). Thus, the court stated:

> Defendant PROC argues that there was no privity between it and the plaintiff and that they never supplied or intended plaintiff to receive the information. While we recognize the potential merit to defendant's argument, we believe that genuine issues of material fact still exist as to the expectations of the parties in the dissemination and receipt of the information supplied to Old Forge Bank by PROC.

*Id.* at *12–13.

Other courts, however, have balked at allowing such negligent misrepresentation claims against accountants by a third party not in privity. *Phar–Mor*, 892 F.Supp. at 694 ("In sum, we conclude that the negligent misrepresentation claims of plaintiffs are merely cloaked professional malpractice claims and that, under Pennsylvania law, privity is a requisite element of such claims."); *see also Neuberger v. Shapiro*, No. 97–7947, 1998 WL 408877, at *4 (E.D.Pa. July 17, 1998) ("Liability [for negligent misrepresentation] is limited by privity and reliance requirements."); *PNC Bank*, 899 F.Supp. at 1408 ("I am convinced that Pennsylvania's strict adherence to the privity rule would result in ruling that negligent misrepresentation may not be used to plead professional negligence claims by persons not in privity with the professional defendant."). In *Phar–Mor*, the court conceded that other district courts had concluded that privity was not required to maintain a negligent misrepresentation claim. *Id.* at 691–92. The court, however, determined that the courts that had abandoned the privity requirement had done so without adequate analysis. *Id.* The district court concluded that the only time in which an accountant could be held liable for negligent misrepresentation in the absence of privity is where the accountant had a pecuniary interest in the transaction. *Id.* at 693–94. Thus, the court stated:

> In the instant case, there is no allegation that Coopers [the accounting firm] had a pecuniary interest in the transaction between plaintiffs and Phar–Mor and, thus, Coopers owed no duty to plaintiffs which would be akin to the duty owed by a seller or other interested party. Instead, the allegation that is at the heart of plaintiffs' negligent misrepresentation claims, to-wit, that Coopers breached its duty to audit Phar–Mor's financial statements in accordance with generally accepted auditing standards, would also be the foundation for the assertion of professional negligence claims. Because the duty to perform the audit in accordance with those standards arose out of the contract between Coopers and Phar–Mor, it was, under Pennsylvania law, owed to Phar–Mor only.

*Id.* at 694. In *Phar–Mor,* the court adhered strictly to the privity requirement as a necessary component for any negligence action under Pennsylvania law.[12]

In *PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp.,* 899 F.Supp. 1399 (W.D.Pa.1994), the court considered the applicability of a Third Circuit negligent misrepresentation precedent to a claim against an accountant for negligent misrepresentation in connection with the preparation of audited financial records which were relied upon by a party not in privity with the accountant:

> In *Eisenberg v. Gagnon,* [766 F.2d 770 (3d Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) ], the court was reviewing the entry of a judgment n.o.v. for an attorney on a claim of negligent misrepresentation with respect to tax shelters in which plaintiffs invested. Defendant attorney asserted that the judgment of the lower court could be affirmed since no attorney-client relationship existed between him and the investors who alleged they were deceived by the offering memoranda which contained the attorney's representations concerning the tax shelters. The court noted that the theory presented by the plaintiffs was not that the attorney breached a duty which he owes one in privity with him, but instead that he misrepresented the nature and the value of goods in a transaction. . . . In *Eisenberg,* the plaintiffs alleged that the attorney misrepresented the nature of the tax shelters offered, and concealed the fact that he and his coconspirators would keep the lion's share of the profits. Here, however, [the accountant] is not a party alleged to have misrepresented the nature and value of goods. Rather, the [plaintiffs'] claim, although couched in terms of negligent misrepresentation, clearly involves the alleged breach by [the accountant] of its obligation to perform audits of HMC financial statement according to Generally Accepted Auditing Standards. This is the very heart of a professional negligence claim.
>
> Clearly, the Court of Appeals has concluded that Pennsylvania would recognize an exception to the privity requirement where the professional becomes directly involved in an effort to market a product. Here, the audit reports were used by HMC as part of its ongoing business relationships with the [plaintiffs], and not in an effort to market either HMC or any investment. The most that can be said is that HMC used [the accountant's] reports to benefit itself through maintaining business relationships with the [plaintiffs]. [The accountant] is not alleged to have profited or expected to profit from the continuation of these relationships. Thus, this case can be distinguished from the situation in *Eisenberg* where the attorney stood to profit directly from the sale of the tax shelters.

*Id.* at 1407–08; *see also Phar–Mor,* 892 F.Supp. at 693–94 (reading *Eisenberg* as eliminating the privity requirement only where the accountant has a pecuniary interest in the transaction).

Both *PNC Bank* and *Phar–Mor* were decided prior to *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604 (3d Cir.1995). In *Duquesne,* the Third Circuit considered whether the economic loss doctrine precluded a negligent misrepresentation claim arising from the sale of defective nuclear steam supply systems. In that case, the parties were clearly in privity. The defendant argued that the contract limited its potential liability and

---

**12.** The court recognized that its holding conflicted with § 552(2), which allows a claim for negligent misrepresentation to be made against an accountant by "the person or one of a limited group of persons for whose benefit [the accountant] intends to supply the information or knows that the recipient intends to supply it." The court, however, determined that this section was contrary to Pennsylvania law. *Id.* at 694 n. 19 ("[W]e find the provisions of section 552(2) to be in direct conflict with the holding of *Guy* and, therefore, not an accurate statement of Pennsylvania law.").

thus a negligent misrepresentation claim could not be maintained. The Third Circuit agreed:

> [A] close reading of section 552 itself reveals that the Restatement is concerned with liability in cases where contract remedies are unavailable. The section's imposition of liability on those who "suppl[y] false information for the guidance of others in their business transactions," does not lend itself very easily to a contract situation. *Indeed, virtually all the examples provided in the section involve liability to third parties. The reason is simple: where there is privity in contract between two parties, and where the policies behind tort law are not implicated, there is no need for an additional tort of negligent misrepresentation.* Breach of contract, promissory estoppel, unjust enrichment, and other contract or quasi-contract remedies all protect parties who negotiate and reduce their agreement to writing.

*Id.* at 620 (emphasis added). Thus, the Third Circuit determined that the economic loss doctrine precluded a party from asserting a negligent misrepresentation claim. Although the economic loss doctrine has no applicability to these facts, the Third Circuit's recognition that privity has

little place in a § 552 analysis is apropos to this case. The courts in *PNC Bank* and *Phar–Mor* did not have the benefit of *Duquesne* in making their determination that privity was necessary to maintain a negligent misrepresentation claim under Pennsylvania law.

Given the analysis in *Duquesne*, Pennsylvania's adoption of § 552, and the plethora of case law in Pennsylvania (including this Court's decisions) recognizing a negligent misrepresentation claim under circumstances similar to those presented here, *PNC Bank* and *Phar–Mor* will not be followed in this case.[13] Parente knew that it was performing its work solely for the sale of the Kenco Division. Parente knew that its work would be relied upon in this transaction. Thus, unlike *Phar–Mor*, Parente was not performing services generically for its client; rather, its work was specifically requested for a sales transaction. Moreover, the comments and illustrations in § 552 of the Restatement (Second) of Torts specifically provide that a cause of action for negligent misrepresentation arises under these facts. Likewise, numerous courts within this Circuit have recognized negligent misrepresentation claims against accountants in the absence of privity.[14] The Third Circuit in

**13.** There appears to be a basis to distinguish *Phar–Mor* in that it did not involve a situation in which financial information was specifically requested from an accountant; rather, it appears to have involved the routine preparation of financial information for a corporation. Thus, § 552 would not have applied in *Phar–Mor*. On the other hand, *PNC Bank* appears to involve a situation analogous to the present case, *i.e.*, the accountant's client specifically requested that audited financial statements be presented to a party with which it was conducting business. To this extent, *PNC Bank* falls directly within the body of § 552.

**14.** Moreover, a number of courts outside Pennsylvania that have considered this question have abandoned the privity requirement for a negligent misrepresentation claim in favor of the approach provided under § 552. *See, e.g., Quinn v. McGraw–Hill Cos.,* 168 F.3d 331, 333 (7th Cir.1999) ("The Illinois Su-

preme Court has recognized that the tort of negligent misrepresentation extends to third parties who lack privity with the defendant where the 'defendant knew the information would be used and relied upon' and 'the potential liability was restricted to a comparatively small group.' "); *First Nat'l Bank of Durant v. Trans Terra Corp. Int'l,* 142 F.3d 802, 809 (5th Cir.1998) ("[A] negligent misrepresentation claim is not premised on the breach of a duty a professional owes his client or others in privity, but on an independent duty based on the [accountant's] manifest awareness of plaintiff's reliance on the representation and intention that the plaintiff so rely."); *Menuskin v. Williams,* 145 F.3d 755, 762 (6th Cir.1998) (noting that Tennessee had adopted § 552 and dispensed with the privity requirement); *Bily v. Arthur Young & Co.,* 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 834 P.2d 745, 769 (1992) (adopting § 552 and finding that no privity required for negligent misrepresentation claim against an accountant); *First*

*Duquesne* recognized that privity concepts do not fit well with negligent misrepresentation claims under § 552. This case does not present the specter of near limitless liability caused by the accountant's knowledge "of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated." Restatement (Second) of Torts § 552 cmt. h. Indeed, it presents a scenario sufficiently approaching privity as to warrant liability. *See Blaushild,* 897 F.Supp. at 906. Accordingly, Parente's motion for summary judgment on the ground that privity is required to maintain a negligent misrepresentation claim will be denied.

### 3. Justifiable Reliance

■ Parente also argues that the negligent misrepresentation claim must fail because Williams cannot demonstrate justifiable reliance on any documents provided by Parente:

> [Williams] is contending that it was "induced" to sign a Memorandum of Intent on June 14, 1993, to sign the Agreement on August 1, 1993 and to close the transaction on August 14, 1993, by information contained in documents that it could not have received before September 15, 1993. Once again, these allegations represent, at best, a misconception of the sequence of events in this case and, at worst, a deliberate attempt to mislead the Court with fabricated allegations.

(Def's Supp. Br. (Dkt. Entry 28) at 25.) While Parente is correct that there is no support in the record to suggest that Williams relied upon documents prepared by Parente prior to September 15, 1993,

Parente fails to address the contention that Williams relied upon Parente's work in accepting the final purchase price. To this extent, the Asset Purchase Agreement provided that Parente would prepare and audit a closing balance sheet within 45 days of the closing. (Appendix (Dkt. Entry 30) Ex. A, ¶ 1.6(a).) Moreover, the Asset Purchase Agreement also provided that the purchase price could be adjusted either upward or downward "by an amount equal to the difference in the net book value of the Business on the Closing Balance Sheet as compared to the Interim Balance Sheet." (*Id.*) It is undisputed that Parente provided this information to Sparkomatic, which in turn provided it to Williams. It is also undisputed that Parente was aware that this information would be provided to Williams in connection with the transaction. Although the Asset Purchase Agreement also provided that Williams' independent public accountants could review the relevant financial records, such independent review bolsters Williams' argument that Parente was aware that Williams would be relying upon Parente's work.

■ "[T]he question of justifiable reliance is most appropriately left to the jury. Reasonableness of reliance involves all of the elements of the transaction, and is rarely susceptible of summary disposition." *In re Atlantic Fin. Management, Inc. Sec. Litig.,* 718 F.Supp. 1003, 1008 (D.Mass. 1988). That Williams' accountant reviewed Parente's work product does not compel a contrary conclusion. *See Fort Washington Resources, Inc. v. Tannen,* 858 F.Supp. 455, 461 (E.D.Pa.1994); *Rempel,* 370 A.2d at 368. Accordingly, Parente's motion for summary judgment on the ground that

*Fla. Bank v. Max Mitchell & Co.,* 558 So.2d 9, 16 (Fla.1990) ("As such [§ 552] balances, more so than the other standards, the need to hold accountants to a standard that accounts for their contemporary role in the financial world with the need to protect them from liability that unreasonably exceeds the bounds of their real undertaking." (quoting *Raritan River Steel Co. v. Cherry, Bekaert & Holland,*

322 N.C. 200, 367 S.E.2d 609, 617 (1988)); *Kohala Agriculture v. Deloitte & Touche,* 86 Hawai'i 301, 949 P.2d 141, 158 (Ct.App.1997) ("Negligent misrepresentation as defined in section 552 has been approved by a majority of courts as 'steering a middle course' between privity and foreseeability in cases alleging negligent misrepresentation by an accountant." (collecting cases)).

justifiable reliance cannot be shown will be denied.

## C. Third Party Beneficiary

■ Under Pennsylvania law, in order for a third-party beneficiary relationship to arise, the third party obligation generally must appear within the contractual language. *See Pell v. Weinstein*, 759 F.Supp. 1107, 1119 (M.D.Pa.1991) ("[T]he obligation to the third party must be created, and must affirmatively appear, in the contract itself."), *aff'd mem.*, 961 F.2d 1568 (3d Cir.1992); *see also PNC Bank*, 899 F.Supp. at 1408. Williams has not been specifically designated as a beneficiary in any written contract to which Parente is a party.

■ There is, however, a limited exception to the rule that the creation of third-party contract rights be clearly set out in the agreement itself. The Pennsylvania Supreme Court has adopted Restatement (Second) of Contracts § 302 (1979) to allow recovery by third party *intended* beneficiaries. *See Scarpitti v. Weborg*, 530 Pa. 366, 372, 609 A.2d 147 (1992); *Guy*, 501 Pa. at 60, 459 A.2d 744. Under the *Restatement* approach, a two-part test must be satisfied:

> (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of the parties," and (2) the performance must "satisfy an obligation of the promisee to pay money to the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."

*Scarpitti*, 530 Pa. at 371, 609 A.2d 147 (quoting *Guy*, 501 Pa. at 60, 459 A.2d 744). The first part of the test is committed to the court's discretion. *Id.*

■ Parente sent Sparkomatic an engagement letter dated July 27, 1993. (Def's Exs. (Dkt. Entry 30) Ex. A.) In this engagement letter, Parente specifically stated, *inter alia*, that:

> The purpose of our engagement is to audit Kenco Engineering, a division of Sparkomatic Corporation (the "Division") financial statements at December 31, 1992, 1991 and 1990 and for the years then ended, and to evaluate the fairness of presentation of such financial statements in conformity with generally accepted accounting principles.

> \*    \*    \*    \*    \*    \*

> The purpose of our engagement is to certify the pro forma "Interim Balance Sheet" which has been prepared by the management of Kenco Engineering, a division of Sparkomatic Corporation (the "Division") and presented as part of closing documents in conjunction with the asset sale of Division. It is our understanding that the Interim Balance Sheet will not reflect any assets not being purchased or liabilities being assumed as outlined in the Asset Purchase Agreement dated July 30, 1993. We will complete our audit of the Interim Balance Sheet within the 45 days time limit ending September 13, 1993.

(*Id.*) Thus, it is apparent that Parente was aware of the sales agreement between Sparkomatic and Williams prior to its engagement. Moreover, it is also apparent that Parente was aware that its work product would be used in connection with the closing. Finally, Parente's report dated September 9, 1993 confirmed Parente's knowledge that its work product was being supplied for the benefit of Williams: "This report is intended solely for the information and use of the boards of directors and managements of Kenco Engineering and KENCO/WILLIAMS, INC. and should not be used for any other purpose." (*Id.*)

In *PNC Bank*, the court, after dismissing the negligent misrepresentation claim for lack of privity, considered whether the plaintiffs could maintain a third party beneficiary claim against the defendant-accountants:

> The court should . . . look to the contract itself, and relevant, expressed intentions. HMC and [the accountants]

contracted for the provision of a competent audit report.... As part of that contract, HMC and [the accountants] intended the [plaintiffs] to receive the benefit of an audit conducted in accordance with professional standards. Indeed, without the obligation to provide the audit to the [plaintiffs], it is not clear that an audit would have been performed at all. Hence, recognition of the [plaintiffs'] right to rely on the audit report is appropriate to effectuate the intent of the parties. Further, the circumstances surrounding the execution of the contracts indicate that HMC intended that the [plaintiffs] receive the benefit of the promised performance. Hence, I find that the [plaintiffs] have stated a claim as a third party beneficiary of the contracts between HMC and [the accountants] for audit reports with respect to HMC's 1989, 1990 and 1991 financial statements....

*PNC Bank,* 899 F.Supp. at 1408–09. Courts in other jurisdiction have also found that a party may be a third party beneficiary to a contract with an accountant to provide financial statements. *See, e.g., Ward v. Ernst & Young,* 246 Va. 317, 435 S.E.2d 628, 635–36 (1993) (finding that where accounting firm was aware that audits were to be performed in connection with sale of stock, sole shareholder of selling corporation was a third party beneficiary); *cf. Seaboard Surety Co. v. Garrison, Webb & Stanaland, P.A.,* 823 F.2d 434 (11th Cir.1987) (finding trial court properly instructed jury that surety could be third party beneficiary of contract between accounting firm and surety's principal).

In this case, Parente was engaged for the sole purpose of providing and auditing financial information to be used in connection with the sale of the Kenco Division. Parente had never conducted a separate audit of the Kenco Division. Moreover, it is not apparent that such an audit would have been performed but for the proposed sale. Parente knew that Williams would be provided its work product and that its work product would be relied upon in some degree to determine the ultimate purchase price for the Kenco Division.

Under these circumstances, recognition of Williams' right to rely on Parente's reports is appropriate to effectuate the intention of Parente and Sparkomatic: both understood that Parente's work product was the key determinative factor in arriving at the final purchase price.[15] Thus, the first of the two elements of a third party beneficiary claim under the Restatement approach is resolved in Williams' favor.

■ The second element concerns either whether Parente's performance would satisfy an obligation of Sparkomatic to Williams, or whether Sparkomatic intended Williams to receive the benefit of Parente's performance. Clearly, the first scenario does not pertain here. As to the second scenario, Parente disclaims any intent to benefit Williams. The surrounding circumstances, however, suggest such an intent. The resulting dispute precludes summary judgment on the third party beneficiary claim. *See Iversen Baking Co. v. Weston Foods, Ltd.,* 874 F.Supp. 96, 101–02 (E.D.Pa.1995); *State Farm Mutual Automobile Ins. Co. v. HHS Assocs.,* No. 93–5943, 1995 WL 739703, at *1 (E.D.Pa. Dec.1, 1995).

### III. CONCLUSION

Because there is no privity between Parente and Williams, Parente's motion to dismiss Williams' negligence claim will be granted. Because privity is not required for a negligent misrepresentation claim and material facts are in dispute as to whether Williams justifiably relied upon Parente's work product, Parente's motion for summary judgment on the negligent misrepresentation claim will be denied. Because a question of fact exists as to

---

**15.** Whether Williams is to be accorded the status of a third party beneficiary is an issue of law and not a question of fact. *See Hicks v. Metropolitan Edison Co.,* 665 A.2d 529, 536 (Pa.Commw.1995), *app. denied,* 544 Pa. 638, 675 A.2d 1253 (1996).

whether Williams was an intended beneficiary of the contract between Parente and Sparkomatic, Parente's motion for summary judgment on the third party beneficiary claim will be denied.