J-A02015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| FULTON BANK, N.A. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| PAUL A. SANDQUIST, PATRICIA A. ZWAAN, BARRY L. SPEVAK AND DOWNEY, SPEVAK & ASSOCIATES, LTD. | |
| Appellee | No. 2306 EDA 2016 |

Appeal from the Order June 1, 2016
In the Court of Common Pleas of Chester County
Civil Division at No(s): 2016-01908-TT

BEFORE:  OTT, J., RANSOM, J., and FITZGERALD, J.[*]

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 27, 2017**

Fulton Bank, N.A. ("Bank"), appeals from the order entered on June 1, 2016, which granted Barry L. Spevak[1] and Downey, Spevak & Associates, Ltd.'s ("Accountants") preliminary objections.[2]  The Bank asserts the court

---

[*] Former Justice specially assigned to the Superior Court.

[1]  Spevak is a certified public accountant and a principal of the accounting firm, Downey, Spevak & Associates, Ltd.  **See** Amended Complaint, 4/19/2016, at 3.

[2]  The court entered a companion order on the same day, dismissing all claims as to co-defendants Patricia Zwaan and A. Paul Sandquist.  Zwaan was the Director of Operations at HiFi House, a home theater installation business that was founded by Saul Robbins.  Sandquist was the Chief Financial Officer/Chief Operating Officer of HiFi House.  As will be discussed
*(Footnote Continued Next Page)*

erred in finding that it did not present viable claims for negligent misrepresentation, fraud, and negligence *per se*. Based on the following, we affirm in part and reverse in part.

The trial court set forth the facts as follows:

> This matter arises out of a relationship between High Fidelity House, Inc. ("HiFi House" [or "HiFi"]), who is not a party to this action, and the Bank related to a loan made to HiFi House … by the Bank. The Accountants, since at least 1986 had been providing accounting services, including preparation of tax returns, financial statements, to HiFi House and had no independent relationship with the Bank. In 2012, HiFi House reached out to the Bank to advise that it was seeking refinancing of its existing indebtedness. At the initial meeting, representatives from HiFi House and the Bank met and began introductory conversations. Following the meeting, the Bank requested certain financial documentation in order to evaluate HiFi House's request for financing, which HiFi House provided, including the 2008-2011 financial statements prepared by the Accountants. The Bank alleges that these financial documents contained material misrepresentations as to the financial condition of HiFi House.
>
> At a second meeting, the discussions focused on the 2011 Financial Statement, which the Bank alleges that the Accountants gave to HiFi House for the express purpose of providing to the Bank. The Bank avers that the financial statements at issue were required to comply with generally accepted accounting principles. Following its review of HiFi House's financial documentation, the Bank issued a commitment letter to HiFi House, which accepted the terms and conditions set forth therein. The Bank subsequently extended HiFi House a commercial line of credit in the original principal amount of $4,200,000. In addition, the Bank extended another loan to HiFi House in the amount of $1,800,000.

*(Footnote Continued)* ───────────

in more detail below, the Accountants provided accounting services to HiFi House. That companion order was not appealed.

The commitment letter required HiFi House to prepare and submit to the Bank monthly borrowing base certificates ("BB Certificates"), certifying the value of inventory and the amount and age of its accounts receivable. The Accountants did not prepare the BB Certificates.

In October of 2012, HiFi House sought an additional line of credit to support a project at Drexel University. On January 7, 2013, the Bank extended another commercial loan to HiFi House in the amount of $1,250,000.

The commitment letter also required that HiFi House maintain[] certain financial ratios and other financial covenants, which HiFi House did not meet for fiscal year 2012. However, the Amended Complaint avers that HiFi House and Accountants represented to the Bank that they would be cleaning up HiFi House's books and records moving forward. As a result, the Bank agreed to waive the covenant violations.

In spring of 2014, the Bank alleges it learned of certain systemic fraudulent practices of HiFi House with respect to its accounts receivable reporting whereby HiFi [House] "refreshed" accounts receivable that had aged to or beyond ninety (90) days from the original date of invoice. The Bank alleges that the Accountants were "aware" of this practice. There is no allegation that HiFi House's practice was initiated by or done with the concurrence of the Accountants. The Bank alleges that the Accountants did not take sufficient steps to determine whether the age of the receivable remained less than one year old. This practice, according to the Bank's allegations, allegedly violated generally accepted accounting principles.

The Accountants prepared a draft 2013 Financial Statement showing a loss of $583,000 for 2013. HiFi House again informed the Bank that it would not meet its loan covenants. HiFi House subsequently retained a financial management consulting company ("ESB") which specialized in turning around troubled companies. The Bank also engaged an independent financial investigation of HiFi House, performed by Trump Lender Services, Inc. ("TLS"). TLS prepared a report which, according to the Bank, details the manner in which HiFi House "fraudulently and intentionally manufactured inaccurate records of inventory and accounts receivable, using same to

induce [the Bank] into extending credit to HiFi House." The Bank clearly avers that HiFi House "intentionally and grossly exaggerated and misrepresented" its inventory and accounts receivable. HiFi House has ceased operations as of spring or summer of 2014. It has insufficient assets to repay the Bank.

[On March 3, 2016, t]he Bank commenced litigation against the owners of HiFi House, Saul Robbins and Jon Robbins, in the Delaware County Court of Common Pleas.[3] In the instant action, the Bank asserted claims, including fraud (Count I), fraudulent misrepresentation (Count II), fraud in the inducement (Count III), negligent misrepresentation (Count IV), [c]onspiracy (Count V), [n]egligence [p]er [s]e (Count VI) and [c]oncerted [t]ortious [c]onduct ([a]iding and [a]betting) (Count VII) against Accountants.

Trial Court Opinion, 7/15/2016, at 1-4 (record citations omitted; emphasis removed).

The Bank filed an amended complaint on April 19, 2016. The Accountants filed preliminary objections on May 11, 2016. On June 1, 2016, the court granted the preliminary objections and dismissed the Bank's amended complaint with prejudice. The Bank did not seek reconsideration of the trial court's decision. This appeal followed.[4, 5]

---

[3] The Delaware County action is not a part of the present appeal.

[4] On June 21, 2016, the trial court ordered the Bank to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The Bank filed a concise statement on July 7, 2016. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on July 15, 2016, adopting in part its findings made in its June 1, 2016, order.

[5] In its statement of questions involved, the Bank presented the following additional issue: "Did the trial court abuse its discretion in refusing to

*(Footnote Continued Next Page)*

We begin with our well-settled standard of review:

> [O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Richmond v. McHale*, 35 A.3d 779, 783 (Pa. Super. 2012) (internal citations omitted).

In the Bank's first issue, it claims the Accountants are liable for negligent misrepresentation pursuant to Section 552 of the Restatement (Second) of Torts. *See* Bank's Brief at 18. Specifically, the Bank states that Section 552 applies "directly and precisely to the conduct engaged in by" the Accountants. *Id.* In support of this argument, the Bank relies on *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270 (Pa. 2005), in which the Pennsylvania Supreme Court expressly adopted Section 552.

*(Footnote Continued)* ————————

permit the filing of an amended complaint?" Bank's Brief at 7. However, it has abandoned that issue in the argument section of the brief. Therefore, we need not address the claim further.

The Bank suggests the trial court erroneously "found that **Bilt-Rite** applies only to architects, and distinguishes **Bilt-Rite** from the instant case, based upon the difference between architects and accountants."  Bank's Brief at 19.  The Bank contends the language in **Bilt-Rite** is not limited to just architects.  **Id.** at 19-20.  Furthermore, it states:

> The Bank is not aware of any Pennsylvania case directly on point with the instant case, *i.e.*, involving a bank seeking damages from its borrower's outside accountants, premised on the bank's reliance on the accountant's negligent misrepresentations contained in the accountant's financial statements that were prepared in connection with the accountant's engagement with the borrower.  There seems no reason – logical, policy-based, or otherwise – however, to exempt accountants from the application of this holding.  **Bilt-Rite** held that an architect, hired by a property owner to prepare plans and specifications, could be liable to a contractor that relied upon the architect's plans and specifications in preparing its bid to the owner.  There is really nothing different here, where the borrower hires the accountant to prepare financial statements, which are then provided to a bank, which uses them to underwrite a loan request from its potential borrower.  [The Bank]'s position *vis a vis* Spevak is exactly analogous to the contractor's position in relation to the architect in **Bilt-Rite**.  Spevak prepared financial statements for HiFi pursuant to his firm's longstanding professional engagement with HiFI.  Spevak knew that the financial statements were to be relied upon by HiFi's lenders.  In fact, Spevak actually provided, by email on May 3, 2012, the financial statements that were actually delivered to the Bank[.]  Spevak met with the Bank on May 11, 2012 to discuss these very same financial statements.  The financial statements attached as Exhibit C to the Amended Complaint contain material misrepresentations as to the value of HiFi's accounts receivable and its inventory that [Accountants] knew were false.  [The Bank] relied upon and used these materials to analyze HiFi's financial status, and formulated its loan proposal for HiFi based upon those financial statements.  [The Bank]'s loan proposal was, in this regard, no different from the contractor's bid to the owner in **Bilt-Rite**.  The loan proposal, like the contractor's bid,

was accepted, and [the Bank], like **Bilt-Rite**, came out on the short end of things, because of the misrepresentations.

Bank's Brief at 21-22 (record citations omitted).

Pennsylvania has applied both the common law and Restatement (Second) of Torts § 552 interpretations of a negligent misrepresentation claim to case law. **See Bortz v. Noon**, 729 A.2d 555, 561 (Pa. 1999); **Bilt-Rite Contractors, Inc.**, 866 A.2d at 280, 285. The common law factors are as follows:

> Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words. Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another.

**Bilt-Rite**, 866 A.2d at 277 (citations omitted).

Section 552 sets forth the elements in a different manner:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction. . . .

Restatement (Second) of Torts § 552 (1979).

In **Bilt-Rite**, **supra**, a school district entered into a contract with an architectural firm, The Architectural Studio ("TAS"), to design a new school. The district also solicited bids from contractors for all aspects of the project, including the firm's "plans, drawings, and specifications in the bid documents supplied to the contractors." **Bilt-Rite**, 866 A.2d at 272. The school district awarded the general construction contract to Bilt-Rite, who was the lowest responsible bidder. **Id.** "TAS's plans provided for the installation of an aluminum curtain wall system, sloped glazing system and metal support systems, all of which TAS expressly represented could be installed and constructed through the use of normal and reasonable construction means and methods, using standard construction design tables." **Id.** After construction commenced, though, Bilt-Rite discovered the work required it "to employ special construction means, methods and design tables, resulting in substantially increased construction costs." **Id.** Bilt-Rite then filed a suit against TAS based upon a theory of negligent misrepresentation pursuant to Section 552, "claiming that TAS's specifications were false and/or misleading, and seeking damages for its increased construction costs." **Id.**

at 273. TAS filed preliminary objections, which were sustained by the trial court and affirmed by a panel of this Court. *Id.* at 273-274.

The Pennsylvania Supreme Court granted review to determine

the first impression question of whether a building contractor may maintain a negligent misrepresentation claim against an architect for alleged misrepresentations in the architect's plans for a public construction contract, where there was no privity of contract between the architect and the contractor, but the contractor reasonably relied upon the misrepresentations in submitting its winning bid and consequently suffered purely economic damages as a result of that reliance.

*Id.* at 272. In analyzing the issue, the Supreme Court opined:

We are persuaded by [] decisions from our sister jurisdictions that: (1) this Court should formally adopt Section 552 of the Restatement (Second), which we have cited with approval in the past, as applied by those jurisdictions in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under Section 552; and (3) the economic loss rule does not bar recovery in such a case. Recognizing such a cause of action, with such contours, is consistent with Pennsylvania's traditional common law formulation of the tort of negligent misrepresentation.

Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs. The Section imposes a simple reasonable man standard upon the supplier of the information. As is demonstrated by the existing case law from Pennsylvania and other jurisdictions, and given the tenor of modern business practices with fewer generalists and more experts operating in the business world, business persons have found themselves in a position of increasing reliance upon the guidance of those possessing special expertise. Oftentimes, the party ultimately

relying upon the specialized expertise has no direct contractual relationship with the expert supplier of information, and therefore, no contractual recourse if the supplier negligently misrepresents the information to another in privity. And yet, the supplier of the information is well aware that this third party exists (even if the supplier is unaware of his specific identity) and well knows that the information it has provided was to be relied upon by that party. Section 552 is not radical or revolutionary; reflecting modern business realities, it merely recognizes that it is reasonable to hold such professionals to a traditional duty of care for foreseeable harm.

*Id. at* 285-286. Consequently, the Supreme Court held:

[W]e hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

*Id.* at 287.

Turning to the present matter, in its Rule 1925(a) opinion, the trial court addressed the issue of whether ***Bilt-Rite*** and Section 552 were applicable to the case. The court opined:

In ***Bilt-Rite***, the Pennsylvania Supreme Court considered on first impression the question of whether a viable negligent misrepresentation claim could be asserted in the context of an architect/contractor/no privity scenario. After a lengthy opinion, the Court held that (1) the Supreme Court should formally adopt § 552 of the Restatement (Second) of Torts as applied in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under § 552 in the architect/contractor scenario; and (3) the economic loss rule did not bar recovery in such a case. Thus, the holding appears to be limited to factual

- 10 -

scenarios involving negligent misrepresentation claims by a contractor against the architect or similar design professionals.

…

Applying the **Bilt-Rite** case to the instant matter, the matters are distinguishable. Here, the issue of negligent misrepresentation arises in the accounting context whereas **Bilt-Rite** involved a general contractor bringing suit against an architect in a school construction case. The Supreme Court's lengthy opinion makes this distinction clear, indicating that its ruling applies specifically to the design professional or limited analogous scenarios. Because the factual context differs and **Bilt-Rite**'s holding appears to be limited, I sought direction from several federal cases which were directly on point.

In **Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates**, 39 F. Supp.2d 517 (M.D. Pa. 1999), the buyer of a corporate division sued the seller's accountants for, *inter alia*, negligent misrepresentation. In denying defendant-accountants['] motion for summary judgment, the court placed great emphasis on the fact that the defendant-accountants were engaged <u>for the purpose</u> of performing certain accounting work related to the sale at issue. **Id.** at 520 (<u>emphasis added</u>). The court also noted that the defendant-accountants had actual notice, prior to their performance, that the work product would be used, *inter alia*, for finalizing the purchase price. **Id.** at 552.

Similarly, in **In re Phar-Mor, Inc. Sec. Litig. and PNC Bank, Kentucky, Inc. v. Hous. Mortgage Corp.**, the courts noted the distinction between an accounting firm engaged for a specific purpose, e.g., to audit financial statements, or as part of an ongoing business relationship. **In re Phar-Mor, Inc. Sec. Litig.**, 892 F. Supp. 676 (W.D. Pa. 1995); see also, **PNC Bank, Kentucky, Inc. v. Hous. Mortgage Corp.**, 899 F. Supp. 1399 (W.D. Pa. 1994).

The instant matter is distinguishable in that the Amended Complaint avers that the Accountants had a long-standing relationship with HiFi House and performed various accounting services for decades, including verifying the accuracy of HiFi House's balance sheets, preparing financial statements and preparing tax returns. See, *Amended Complaint* at ¶17, ¶18 *and*

¶47. They were not engaged, nor is there any allegation that they were engaged, for the purpose of preparing financial statements to be used in obtaining credit from the Bank, or any other potential lending institution. It is reasonably deducible, in the absence of averments to the contrary, that the financial statements provided to the Bank were prepared in the regular course of the ongoing business relationship between HiFi House and the Accountants; that the statements were prepared for HiFi House and no one else; and the relationship between HiFi House and the Accountants predated any contact with this Bank by more than twenty years.

Moreover, § 552 provides an example, Illustration 10 under comment H, which is directly on point:

A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation's financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor's opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be relied upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor's opinion to obtain a loan from X Bank. Because of A's negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is not liable to X Bank. See, *Williams Controls, Inc.*, *supra*, at 537, fn. 10.

In accordance with this illustration, the Accountants could not be held liable to the Bank with respect to any financial statements Accountants prepared for HiFi House prior to the Bank extending credit because there was no factual allegation that the Accountants understood, prior to performing the accounting services at issue, e.g. the preparation of the 2011 Financial Statement, that such work would be used in connection with HiFi House's efforts to seek credit with any financial institution.

In contrast, the Amended Complaint merely alleges that the 2011 Financial Statement had been prepared and that the Accountants at some point thereafter provided it to HiFi House upon request of the Bank for the Bank's review. Thus, the distinction is small but important – there is no allegation that the Accountants prepared the financial documentation with actual notice that it would be used by the Bank (or some other lending institution as opposed to internal use by HiFi House); rather, the Accountants prepared the documents prior to the relationship with the Bank, but subsequently transmitted the documentation upon request to HiFi House, with knowledge that it was going to be reviewed by the Bank.

Perhaps more importantly, however, is the absence of any allegation regarding a pecuniary interest on behalf of the Accountants in the transaction between HiFi House and the Bank, an essential element of the claim for negligent misrepresentation. Instead, the allegation that is at the heart of the Bank's negligent misrepresentation claim, to wit, that Accountants breached their duty to prepare financial statements and review balance sheets in accordance with generally accepted accounting principles, is the very essence of a claim for professional negligence. The Bank is not permitted to circumvent the law through artful pleading to recast a professional negligence claim as one for negligent misrepresentation. See, **In re Phar-Mor, Inc.**, **supra**, 892 F. Supp. 676 at 693; see also, **PNC Bank, Kentucky, Inc.**, **supra**, 899 F. Supp. at 1408.

Trial Court Opinion, 7/15/2016, at 7-12. While the trial court's analysis is thorough, we are constrained to disagree.

We find the court applied a too narrow reading to **Bilt-Rite** in determining that the case only concerns disputes involving an architect/contractor scenario. Rather, we conclude **Bilt-Rite** can be applied to other factual scenarios where a party is providing professional information

that is designed to be relied upon by a third party. **Bilt-Rite**, 866 A.2d at 287. As the Bank argues,[6] the **Bilt-Rite** holding points to the architect or design professional example as an illustrative suggestion, but the Court's wording does not impose a limitation on which kind of situation Section 552 can apply. **See id.** ("[W]e hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, **such as** an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.") (emphasis added).

Moreover, our research has revealed that, while limited, precedence has applied Section 552 and **Bilt-Rite** to a non-architect/contractor dispute. In **Kirschner v. K&L Gates LLP**, 46 A.3d 737, 741 (Pa. Super. 2012), *appeal denied*, 65 A.3d 414 (Pa. 2013), a bankruptcy trustee for a bottle beverage corporation brought an action against the retained law firm and an investigating fraud company, claiming, *inter alia*, negligent misrepresentation pursuant to Section 552 and **Bilt-Rite**. On appeal, the issue was whether the trial court erred in dismissing the trustee's negligent misrepresentation claim at the preliminary objection stage because the

---

[6] **See** Bank's Brief at 20.

trustee alleged: (1) both defendants were professional firms in the business of supplying information; (2) they provided false information concerning the absence of any evidence of fraud; and (3) the bottle beverage company, to its substantial financial harm, justifiably relied on their false information. *Kirschner*, 46 A.3d at 747. A panel of this Court determined that Section 552 and *Bilt-Rite* did apply and the amended complaint averred a legally sufficient cause of action for negligent misrepresentation. *Kirschner*, 46 A.3d at 760.

Additionally, with respect to the court's reliance on *Williams Controls, Inc.*, *supra*, and *In re Phar-Mor, Inc. Sec. Litig.*, *supra*, we note that while persuasive, "decisions of the federal district courts ... are not binding on Pennsylvania courts, even when a federal question is involved." *Kubik v. Route 252, Inc.*, 762 A.2d 1119, 1124 (Pa. Super. 2000) (citation omitted); *see also Feleccia v. Lackawanna Coll.*, 156 A.3d 1200, 1214 n.6 (Pa. Super. 2017). It merits mention that both federal cases relied upon by the trial court in the present matter predate the Pennsylvania Supreme Court's decision in *Bilt-Rite*.[7]

---

[7] Likewise, Illustration 10 under comment H of Section 552, which was noted by *Williams Controls, Inc.* and cited by the trial court in the present matter, was not specifically adopted by the *Bilt-Rite* Court. Further, as will be discussed below, the facts set forth in Illustration 10 are distinguishable from the present matter. Here, as averred by the Bank, the Accountants were informed of the intended use of the financial statements whereas in the
*(Footnote Continued Next Page)*

Furthermore, returning to the trial court's analysis of the allegations set forth in the Bank's amended complaint, *see* Trial Court Opinion, 7/15/2016, at 10-12, we note the Bank alleged the following relevant facts:

32. On the evening of May 3, 2012, at or about 7:04 p.m., Sandquist e-mailed [Betsy] Niedziejko [of the Bank] HiFi House Financial Statements (2008 through 2011), prepared by Defendant Spevak.

…

36. [Jon A.] Robbins,[8] together with Spevak and Sandquist, had a follow-up meeting with Niedziejko and Ken Goddu of Fulton on May 11, 2012 (the "Second Meeting").

37. During this Second Meeting, discussions occurred between Robbins, Spevak, Sandquist (on behalf of HiFi House) and Niedziejko and Goddu, regarding HiFi House's financial statements and financial conditions.

38. The discussions regarding HiFi House's financials were primarily focused on the 2011 Financial Statement, prepared by [the Accountants], which Spevak gave to Sandquist for the express purpose of Sandquist transmitting same to Niedziejko prior to the Second Meeting.

…

44. In preparing financial statements, one of Spevak's inquiries under the review engagement was to ascertain whether HiFi House's accounts receivable were properly reported as current and collectible.

_(Footnote Continued)_ ————————

illustration, the accountant merely knew the documents were customarily used in a wide variety of financial transactions by the corporation.

[8] Robbins was the son of the founder of Hifi House and eventually became Chief Executive Officer and President of the business. *See* Amended Complaint, 4/19/2016, at 4.

45. Spevak testified that accounts receivable may be reported on a balance sheet as current assets if they are less than one year old and deemed collectible by management.

46. Financial Statements, such as those prepared and furnished by [the Accountants] to [the Bank], must be free of material misstatements and must be fairly presented in accordance with generally accepted accounting principles.

…

48. Spevak knew that the 2011 Financial Statement would be used by [the Bank] to assess the financial condition of HiFi House in response to HiFi's request for credit from [the Bank].

…

## Count IV:  Negligent Misrepresentation

…

167. [The Accountants] misrepresented the state of HiFi House's accounts receivable and inventory, through information and documents submitted by [the Accountants] to [the Bank] for purposes of obtaining loans.

168. In the alternative that [the Accountants] did not knowingly make such misrepresentations, they were made negligently which induced [the Bank] into believing that HiFi House was in a better financial position than it actually was.

169. Assuming *arguendo* that their acts were not intentional, [the Accountants] failed to exercise reasonable care or competence in providing accurate financial information to [the Bank], whereby such inaccuracies and misrepresentations improperly inflated HiFi's borrowing base for Loans I, [II,] and III[9] and the value of the collateral for Loans I, II, and III.

---

9  Loan I pertains to a commercial line of credit the Bank extended to HiFi House in the original principal amount of $4,200,000.00 on June 11, 2012. Loan II pertains to a commercial line of credit the Bank extended to HiFi
*(Footnote Continued Next Page)*

170.   [The Accountants] played a role, through their actions and/or inactions aforesaid, in misrepresenting material information and documentation to [the Bank] for purposes of securing and maintaining Loans I, II, and III.

171.   Assuming *arguendo* that their acts were not intentional, [the Accountants]' negligent accounting of its financial condition, including age and value of its accounts receivable and inventory, induced [the Bank] to extend Loans I, II, and III.

172.   [The Bank]'s reliance upon the false figures reported by [the Accountants] on behalf of HiFi House was justifiable as [the Bank] should not reasonably expect a potential borrower to violate the law in providing [the Bank] with financial information.

173.   Further, the actual books and records of HiFi House were kept in such a manner that without knowing of HiFi's improper accounting practices, [the] Bank would have been able to determine same.

174.   [The Bank]'s inability to now collect on the substantial indebtedness owed thereto by HiFi House, causing substantial economic harm, is a proximate and direct result of the Bank's justifiable reliance on [the Accountants]' misrepresentations.

Amended Complaint, 4/19/2016, at 29-30.

Contrary to the trial court's comments, we find that at this stage of the pleadings, the Bank presented a plausible claim alleging a legally sufficient cause of action for negligent misrepresentation.  In accordance with Section 552, the Bank alleged:   (1) the Accountants were in the business of

*(Footnote Continued)* ───────────────

House in the original principal amount of $1,800,000.00 on the same day. Loan III pertains to a commercial loan the Bank extended to HiFi House in the original principal amount of $1,250,000.00 on January 7, 2013.  **See** Amended Complaint, 4/19/2016, at ¶¶ 56, 61, and 69.

supplying professional accounting information for HiFi House; (2) they supplied information regarding the financial condition of HiFi House **for the preparation** of a May 2012 meeting with the Bank; (3) Spevak was present at that meeting where the 2011 financial statements were discussed; and (4) the Bank relied on this information and extended multiple loans to HiFi House. Indeed, the allegations in the amended complaint appear to aver the Accountants prepared the documents for the express purpose of the May 2012 meeting with the Bank. Accordingly, we reverse the trial court's June 1, 2016, order granting the Accountant's preliminary objections as to the negligent misrepresentation cause of action and reinstate the Bank's amended complaint as to that count.

In its next argument, the Bank contends its amended complaint set forth a claim of fraud. Bank's Brief at 28. Specifically, it states:

> To be liable for fraud, Spevak need only to have had reason to expect that [the Bank] would act based on the false and misleading financial statements that he prepared. As the Amended Complaint makes clear, the only purpose for the practice of "refreshing" the accounts receivable was to deceive the only entity relying on the accuracy of those numbers: the lender. There is no legitimate business purpose for this practice.
>
> …
>
> As there is no legitimate basis for the false representations to [the Bank], the totality of the circumstances as pled in the Amended Complaint shows Spevak's intent to deceive [the Bank].

*Id.* at 29-30 (citations omitted). Moreover, the Bank claims:

The trial court … disregards the overall substance of the scheme engaged in by HiFi and Spevak, which is adequately set forth in the Amended Complaint, and elevates form over substance, relying largely upon the single fact that Sandquist was the person that physically emailed the financial statement to the Bank, and that Spevak did not hand them directly to the Bank. The trial court also takes the position that any complaint as to the content of the financial statement, lies with the accountant's client, HiFi. These points, however, do not address the issue of "particularity" of a particular averment. Rather, these points illustrate a fundamental policy position, which, in reality, attends more directly to the applicability of § 552 to this case. It is not an indictment as to a lack of specifics in the pleading.

As set forth above, the financial statements prepared by Spevak were filled with false information, intentionally so, in order to inflate the value of HiFi's assets, and to induce the Bank in to lending more money than it otherwise would.

*Id.* at 31-32.

"Fraud is a generic term used to describe anything calculated to deceive, whether by a single act or combination, or by suppression of the truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Blumenstock v. Gibson*, 811 A.2d 1029, 1034 (Pa. Super. 2003), *appeal denied*, 828 A.2d 349 (Pa. 2003).

To prove fraud, a plaintiff must demonstrate by clear and convincing evidence: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud.

*Id.* (internal citations omitted).

Here, in its amended complaint, the Bank alleged its fraud claim as follows:

134.   [The Accountants] knew that the financial statements, information and documentation maintained, prepared and transmitted by HiFi House to [the Bank] would be used by [the Bank] to assess the financial condition of HiFi House, and to develop the lending limits and borrowing base for Loans I, II and III.

135.   [The Accountants] also knew that their business assets, the majority value of which was accounts receivable and inventory, was the collateral for Loans I, II, and III and thus a primary consideration of [the Bank] in determining whether to extend credit to HiFi.

136.   A large portion of Loan I and Loan II was used to pay off HiFi's obligations to its prior lender, M&T Bank, and thus without the amount of funds ultimately loaned by [the Bank], there would have been no lending relationship at all between HiFi and Fulton.

137.   [The Accountants] acted in bad faith with regard to the information and documentation – comprised of material misrepresentations – provided to [the Bank].

138.   Each and every document HiFi provided to [the Bank] with representations of HiFi's assets, materially misrepresented the age and value of HiFi House's accounts receivables, concealed HiFi House's advanced billing practices, and misstated the value of HiFi's inventory.

139.   The Financial Statements prepared and furnished by [the Accountants] were known by [the Accountants] not to present a fair or accurate image of HiFi's financial position, contrary to generally accepted accounting principles.

140.   [The Accountants]' misrepresentation of HiFi House's finances was intentional.

141. Consequently, the misrepresentations fraudulently inflated HiFi House's lending base and the value of the collateral for Loan I, Loan II, and Loan III, while concurrently concealing HiFi House's financial troubles from [the Bank].

142. The improper practice was known by [the Accountants] and used and concealed by [the Accountants] to secure Loan I, Loan II, and Loan III.

143. [The Bank] would not have extended HiFi House credit if it knew of HiFi's fraudulent accounting practices.

144. [The Bank] also would not have provided HiFi House with Loan I, Loan II, and Loan III if it knew of the actual value of HiFi's collateral and borrowing base, as this would not have supported lending enough money to pay off HiFi's prior lender, M&T Bank.

145. [The Bank]'s reliance upon the fraudulent figures reported by [the Accountants] on behalf of HiFi House was justifiable, as [the Bank] should not reasonably expect a potential borrower to violate the law in providing [the Bank] with financial information.

146. Further, the actual books and records of HiFi House were kept in such a manner that, without knowing of HiFi's fraudulent accounting practices, [the] Bank would not have been able to determine the existence of same.

147. [The Bank]'s inability to now collect on the substantial money loaned to HiFi House, causing substantial economic harm to [the Bank], is a proximate and direct result of the Bank's justifiable reliance on [the Accountants]' misrepresentations.

Amended Complaint, 4/19/2016, at 23-25.

In sustaining the preliminary objections regarding this claim, the trial

court found the following:

Our review of the Amended Complaint reveals that [the Bank] has not pleaded fraud with the requisite particularity. Generally, [the Bank] complains about financial documentation, in part prepared by [the Accountants], which contained misleading and/or false information regarding the financial condition of HiFi.

However, [the Bank] specifically alleges that the HiFi Financial Statements from 2008 through 2011 were provided to [the Bank] by Defendant Sandquist, not [the Accountants]. Any complaints regarding the content of the financial documents prepared by [the Accountants] lies with its client, HiFi, and are not properly asserted by [the Bank]. [The Bank] further alleges that Defendant Spevak attended a meeting with [the Bank], but does not make any specific allegations regarding misrepresentations that were made by Defendant Spevak to [the Bank]. Fraud is insufficiently pleaded where [the Bank] merely complains that the financial documentation created by [the Accountants] and provided to their client, HiFi, contained misrepresentations. Complaints that [the Accountants] failed to use generally accepted accounting principles sounds in negligence, not fraud.

The Amended Complaint further alleges that Defendant Spevak attended a subsequent meeting and, together with Defendant Sandquist, informed [the Bank] that HiFi was unable to meet the financial covenants for the year 2012. This is not alleged to be a false or misleading statement. Additionally, [the Bank] claims that Defendants Spevak and Sanquist represented that they recently discovered the misdealings of HiFi's former CEO, cut ties with him, and would be "cleaning up HiFi House's books and records and financial practices going forward, to ensure nothing like this happened again." At this same meeting, [the Bank] alleges Defendants Spevak and Sandquist represented that they had a strategic plan to improve HiFi's financial position. Again, these representations are not alleged to be false; rather, they constitute "promises" to do something in the future. Accordingly, they cannot form the basis of a claim for fraud. The remainder of [the Bank]'s allegations regarding [the Accountants] similarly cannot support a claim for fraud because they do not amount to representations or were not alleged to be false. Thus, [the Bank] has failed to state a cognizable claim for fraud because it does not plead each element with the requisite level of specificity.

Order of Court, 6/1/2016, at n.1, 3 (record citations omitted). Keeping our

standard of review in mind, we conclude the trial court has thoroughly and

accurately disposed of this fraud issue. Accordingly, we affirm on the basis of the court's analysis.

Lastly, the Bank asserts it set forth a viable claim of negligence *per se* in its amended complaint. Banks' Brief at 33. Specifically, it states:

> The Trial Court found that the Amended Complaint failed to state a claim for Negligence Per Se, as the relevant criminal statutes do not exist to "secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public." This, however, is a misrepresentation of this requirement, as the statutes relied upon in the Amended Complaint clearly exist to protect a specific class of individual crime victims, and not the public at large.

*Id.* (citation omitted). Moreover, the Bank asserted:

> [The Bank]'s negligence per se claims are based upon violations of 18 U.S.C. § 1343, related to wire fraud, and 18 Pa.C.S.A. § 4107(a)(6) related to deceptive or fraudulent business practices. 18 U.S.C. § 1343 contains a specific provision for actions that affect a financial institution (i.e. [the Bank]), and it seems implausible to suggest this statute is not intended to protect [the Bank], a financial institution, as opposed to society at large. Similarly, 18 Pa.C.S.A. § 4107(a)(6) makes it a crime to make or induce "others" to rely on a false or misleading written statement for the purpose of obtaining property or credit. The "others" in the instant matter is clearly [the Bank], as opposed to society at large. In fact, 18 Pa.C.S.A. § 104, it is clearly stated that the purpose of Title 18 of the Crimes Code, is "[t]o forbid and prevent conduct that unjustifiably inflicts or threatens substantial harm to individual or public interest[.]" *Id.* Individual interest is unmistakably what 18 Pa.C.S.A. § 4107(a)(6) exists to prote[c]t.

*Id.* at 34-35.

> In order to prove a claim based on negligence *per se*, the following four requirements must be met:

- 24 -

(1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally;

(2) The statute or regulation must clearly apply to the conduct of the defendant;

(3) The defendant must violate the statute or regulation;

(4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries.

*Mahan v. Am-Gard, Inc.*, 2003 PA Super 510, 841 A.2d 1052, 1058-1059 (Pa. Super. 2003) (citations and quotations omitted).

*Schemberg v. Smicherko*, 85 A.3d 1071, 1074 (Pa. Super. 2014).

The statutes the Bank claims the Accountants violated are as follows.

Section 1343 states:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $ 1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1343.

Section 4107 provides, in pertinent part:

**(a)  *Offense defined.* —** A person commits an offense if, in the course of business, the person:

- 25 -

…

> **(6)** makes or induces others to rely on a false or misleading written statement for the purpose of obtaining property or credit[.]

18 Pa.C.S. § 4107(a)(6).

> Here, the trial court found the following:

> Statutes which the Superior Court has held were too general to support a negligence *per se* claim involve statutes that less clearly indicate an intention to protect specific groups from specific types of harm. *See*, *e.g.*, *Wagner v. Anzon, Inc.*, 684 A.2d 570, 574-575 (Pa. Super. 1996) (holding that there was no negligence *per se* claim based upon violation of Philadelphia Air Management Code, because "the purpose of the Code was to protect the 'atmosphere over the City' of Philadelphia, with … concomitant benefits to its 'inhabitants.'"). After careful review, we conclude that the purposes of 18 U.S.C. § 1343 and 18 Pa.C.S.A. § 4107 are to protect the interests of the general public against wire fraud and deceptive business practices, respectively. We find no indication that either statute was designed to protect a specific group, such as banks or lending institutions. Because [the Bank] does not plead that is a member of a specific protected group, [the Bank]'s claim for negligence *per se* fails.

Order of Court, 6/1/2016, at n.1, 4. Again, keeping our standard of review in mind, we conclude the trial court has thoroughly and accurately disposed of the Bank's negligence *per se* issue. Therefore, we affirm this issue on the basis of the court's analysis.

Accordingly, we affirm the trial court's June 1, 2016, order with respect to the fraud and negligence *per se* causes of action and reverse with regard to the negligent misrepresentation count.[10]

Order affirmed in part and reversed in part. Case remanded for further proceedings. Application for relief denied. Jurisdiction relinquished.

Fitzgerald, J., joins this memorandum.

Ransom, J., files a concurring and dissenting memorandum.

---

[10] We deny the Accountants' December 30, 2016, application for relief based on the argument that the Bank's claims are barred by *res judicata*. The ruling the Accountants seek to introduce is a December 21, 2016, decision by the Honorable Ashely M. Chen of the United States Bankruptcy Court for the Eastern District of Pennsylvania. **See *Fulton, N.A. v. Robbins (In re Robbins)***, 562 B.R. 83 (Bankr. E.D. Pa. 2016). The related proceeding involved Jon A. Robbins, the debtor, and the Bank. It merits mention:

> The doctrine of *res judicata* will preclude an action where the former and latter suits possess the following common elements: (1) identity of issues; (2) identity in the cause of action; (3) identity of persons and parties to the action; and (4) identity of the capacity of the parties suing or being sued.

***Daley v. A.W. Chesterton, Inc.***, 37 A.3d 1175, 1189-1190 (Pa. 2012). A review of both cases reveals that the bankruptcy action and present matter involve different parties and causes of actions. As a result, the doctrine of *res judicata* does not apply.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 9/27/2017*